[Civ. No. 929. Fourth Appellate District.—August 5, 1932.]

THE PEOPLE, Appellant, v. SHOICHI NAKAMURA et al., Respondents.

U. S. Webb, Attorney-General, John L. Flynn, Deputy Attorney-General, Stephen Connell, District Attorney, and E. M. Clark, Deputy District Attorney, for Appellant.

Arthur L. Dorn and J. Marion Wright for Respondents.

BARNARD, P. J.—This is an appeal from a judgment in a proceeding brought by the attorney-general of the state of California and the district attorney of San Diego County, for the purpose of establishing an escheat as to certain agricultural lands in accordance with the provisions of the Alien Land Law.

Among other things, the complaint alleges that the defendant Nakamura is of the Japanese race and born in the Territory of Hawaii; that the defendants Miyada, Ono, Oku, Kurokua and Nagahiro are of the Japanese race, natives of the empire of Japan, subjects of the Emperor of Japan and ineligible to citizenship in the United States; that the above-named defendants purchased certain described agricultural land situated in the county of San Diego and on June 16, 1926, said land was conveyed by deed to the defendant Nakamura; that on that day the other defendants above named paid to the defendant Delpy $6,000 on account of the purchase price of said land; that on two subsequent dates the said Japanese defendants, except Nakamura, made further payments on account of the purchase price of said land; that all of said land has been used for agricultural purposes; that on or about June 16, 1926, the defendants Miyada, Ono, Oku, Kurokua and Nagahiro entered into possession of said real property and ever since said date have occupied the same, using, enjoying and cultivating the said land as their own and in their own right for agricultural purposes; that the taking of the title to the said land in the name of Nakamura was a mere subterfuge and to conceal the real purpose of the transfer; that all of said acts were done by the defendants Nakamura, Miyada, Ono, Oku, Kurokua and Nagahiro with in-

tent to violate and evade the Alien Land Law; that by means thereof these defendants have unlawfully obtained possession, use, occupancy and enjoyment of this agricultural land; and that all of said land has escheated to the state of California. The complaint also alleges that there is no treaty existing between the United States and Japan by which citizens or subjects of the Emperor of Japan are permitted to acquire, possess, enjoy, use and cultivate land for agricultural purposes in the state of California.

In addition to an answer generally and specifically denying each and every allegation of the complaint, the first six defendants above named filed a supplemental answer setting up, first, a plea of not guilty; second, former jeopardy; and, third, that all matters herein had been previously adjudicated in a former criminal action in which these defendants had been acquitted of a violation of section 10 of the Alien Land Law. A demurrer was sustained as to the first of these last three defenses but overruled as to the other two.

The court found that the land in question had been deeded to the defendant Nakamura; that upon the execution and delivery of this deed the defendants Miyada, Ono, Kurokua and Nagahiro moved on to different portions of said property, placed cottages thereon, have ever since resided thereon, purchased seed for use thereon and busied themselves in the cultivation thereof as agricultural land; that the defendant Oku has never occupied any part of said property; and that Kurokua advanced $2,000 to Nakamura, which was used in making the first payment on the property. However, the court found, "by reason of the want of competent proof in support" of certain allegations of the complaint, that it is not true that certain further payments on the purchase price of the land, were made by the defendants alleged to be occupying the premises; that "no competent evidence sufficient to support the allegations of the complaint in that behalf having been adduced", it is not true that any acts were done by the defendants with the intent to violate and evade the law in question or to avoid escheat; and that "no competent evidence having been adduced or received in support" of the corresponding allegations of the complaint, it is not true that the defendants alleged to be occupying and farming the property were

foreign-born Japanese owing allegiance to the Emperor of Japan. Judgment was entered for the defendants, from which this appeal is taken.

Shortly after the trial began an attempt was made by the plaintiff to call the defendants alleged to be in possession of the land as witnesses under the provisions of section 2055 of the Code of Civil Procedure. Objection was made to the effect that this is a criminal proceeding and that under constitutional provisions these defendants cannot be compelled to become witnesses against themselves. These objections were sustained, and this presents what is conceded by all parties to be the principal point to be considered upon this appeal, namely, whether this proceeding is, in substance, civil or criminal.

The respondents rely especially upon the cases of *Boyd* v. *United States*, 116 U. S. 616 [29 L. Ed. 746, 6 Sup. Ct. Rep. 524], and *Thurston* v. *Clark*, 107 Cal. 285 [40 Pac. 435, 437]. In *Boyd* v. *United States*, the court was dealing with a somewhat similar question but in a proceeding to declare a forfeiture of certain property because of the evasion of a certain revenue law. The court points out that the act under which the proceeding was brought made an evasion thereof a criminal offense punishable by fine and imprisonment, with the additional punishment that the merchandise involved should be forfeited. The court said: "These are the penalties affixed to the criminal acts, the forfeiture sought by this suit being one of them. If an indictment had been presented against the claimants, upon conviction the forfeiture of the goods could have been included in the judgment. If the government prosecutor elects to waive an indictment, and to file a civil information against the claimants,—that is, civil in form,—can he by this device take from the proceeding its criminal aspect and deprive the claimants of their immunities as citizens, and extort from them a production of their private papers, or, as an alternative, a confession of guilt? This cannot be. The information, though technically a civil proceeding, is in substance and effect a criminal one."

It was therefore held that suits for penalties and forfeitures incurred by the commission of offenses against the law are of a *quasi*-criminal nature and that they are within the reason of criminal proceedings for all the purposes of

that portion of the fifth amendment to the Constitution of the United States, which declares that no person shall be compelled in any criminal case to be a witness against himself. In *Thurston* v. *Clark,* a proceeding for the removal of an officer, the action was held to be, in substance, criminal; it being held that this portion of the fifth amendment to the Constitution applies "to all cases in which the action prosecuted is not to establish, recover, or redress private and civil rights, but to try and punish persons charged with the commission of public offenses". In its opinion, the court thus defines a criminal case: "A criminal case is an action, suit, or cause instituted to punish an infraction of the criminal laws, and, with this object in view, it matters not in what form a statute may clothe it, it is still a criminal case, . . . "

On the other hand, in *Stone* v. *United States,* 167 U. S. 178 [42 L. Ed. 127, 17 Sup. Ct. Rep. 778, 782], the Supreme Court has pointed out that the rule thus referred to has no application in a case turning wholly upon an issue as to the ownership of property. In that case, the court said: "In the present case the action against Stone is purely civil. It depends entirely upon the ownership of certain personal property. The rule established in Coffey's case can have no application in a civil case not involving any question of criminal intent or of forfeiture for prohibited acts, but turning wholly upon an issue as to the ownership of property. In the criminal case the government sought to punish a criminal offense, while in the civil case it only seeks, in its capacity as owner of property, illegally converted, to recover its value . . . "

The decision of the question now before us seems to depend largely upon whether such an escheat as we are considering is a punishment for the infraction of a criminal law, involving criminal intent and being by way of a forfeiture as a penalty for an offense committed, or whether it is a rule of property turning wholly upon an issue as to ownership thereof and title thereto. It may first be observed that under the statute here in question, neither the acceptance of a deed to agricultural lands nor the occupancy and use thereof is made a crime or a public offense. In *In re Akado,* 188 Cal. 739 [207 Pac. 245, 246], the court said: "The act forbids such transfer and this makes it im-

possible for any person to convey land to an alien ineligible to citizenship by any transfer that would be valid as against the state of California, although it might be valid with respect to all other persons. We must assume that the people in adopting this statute believed that the state of California could protect itself against the alien who had received a conveyance of such land whenever its officers became advised of the fact, without any provision making the execution of the conveyance itself a crime.''

In *Mott* v. *Cline*, 200 Cal. 434 [200 Pac. 434], in speaking of another provision of the Alien Land Law not herein involved, the court said: ''This is the only act that is made a public offense and penalized by imprisonment or fine or by both. (*In re Akado*, 188 Cal. 739 [207 Pac. 245].) The exaction imposed for all other violations of the act inhibiting transfers is that the conveyance is rendered void as to the state and the real property escheats to the state upon action brought by the attorney-general or district attorney of the county in which the violation occurs. (*Cockrill* v. *People of State of California*, 268 U. S. 258 [69 L. Ed. 944, 45 Sup. Ct. Rep. 490].)''

█ In the case last cited, the court also said: ''Our statute follows the common law as to the escheat proceedings.'' The respondents take this statement as holding that complete proceedings for such an escheat are not provided by our statute and that we must therefore look to the common law and be guided by its procedure in case of a similar escheat. While we think our statute does establish the procedure to be followed, we also think that this procedure is essentially like that which prevailed under the common law under somewhat similar circumstances, and that it is in this sense that the Supreme Court made the statement referred to.

In *State* v. *Savings Union Bank*, 186 Cal. 294 [199 Pac. 26], the court points out that there were two kinds of escheats at common law. The first was based upon a theoretical failure in the line of descent, the theory being that the land reverts to the sovereign because of the technical nonexistence of any heirs. The other form of escheat at common law arose by way of penalty or forfeiture and as a part of the punishment for felony or treason. In that case the court held that an escheat under subdivision 9

of section 1386 of the Civil Code is of the kind first mentioned and does not imply or require a forfeiture as a condition precedent. It was then held that an escheat under section 1273 of the Code of Civil Procedure is one of the second kind and therefore in the nature of a statutory forfeiture and subject to the rules applying to forfeitures. It will be noted that an escheat under subdivision 9 of section 1386 is thus held to be one of the first kind and not dependent upon a forfeiture, although it does not take effect until the end of the statutory period, and although a form of judicial action is necessary to declare the existence of the escheat. Both at common law and under our decisions some judicial procedure is necessary to perfect the escheat, under either of the classes of escheat referred to. An escheat, under this portion of section 1386 applies to any alien, even though he may be eligible to citizenship and even though such an alien may hold real estate against everyone, including the state, until office found.

While the court in the case last referred to was considering the two statutes named in connection with the rights of aliens eligible to citizenship, in the statute now before us we are concerned with a consideration of the rights of aliens ineligible to citizenship. If we look to the common law, the form of escheat now before us, is analogous to that form which arose from the theoretical failure of competent heirs and is one of the first kind above referred to, which did not imply or require a forfeiture as a condition precedent. Under the statute here in question, a conveyance to an ineligible alien is absolutely void and such an alien may not take title at all unless by virtue of an existing treaty, an exception which has no application here. While a transfer to such an alien is forbidden, neither the act of making nor the act of receiving a conveyance is made a criminal offense. The attempted transfer is merely void for the want of anyone competent to take. Section 2 of the act provides that an ineligible alien may acquire, possess, enjoy, use, cultivate, occupy, transfer and have the beneficial use of real property only in accordance with an existing treaty, and not otherwise. Section 7 provides that any real property acquired in fee by such an alien in violation of the provisions of the act, shall escheat to the state of California as of the date of such acquiring. It also provides that the

attorney-general or district attorney of the proper county shall institute proceedings to have the escheat of such property adjudged and enforced and that upon the entry of final judgment, the title to such property shall pass to the state as of the date of such acquisition in violation of the provisions of the act. Section 8 makes similar provisions to cover any interest in real property less than a fee. Section 9 provides that such transfer of real property or of an interest therein shall be void as to the state and that the interest conveyed or sought to be conveyed shall escheat to the state as of the date of the transfer, if it be agricultural land and if the conveyance is made with intent to evade or avoid the provisions of the statute.

It seems to us that this act does not require a forfeiture as a condition precedent to an escheat. It is not a case where an ineligible alien may lawfully hold title to the property until it is later taken away from him by way of penalty. Such an alien may not legally take title in the first place and there is, therefore, no forfeiture in the sense of taking away a right already accrued, by way of penalty or otherwise. In passing upon a contract with an ineligible alien relating to the use of agricultural land and in considering the Alien Land Law of this state, the court said in *Webb* v. *O'Brien*, 263 U. S. 313 [68 L. Ed. 318, 44 Sup. Ct. Rep. 112, 114]: "The act as a whole evidences legislative intention that ineligible aliens shall not be permitted to have or enjoy any privilege in respect of the use or the benefit of land for agricultural purposes. . . . The question in this case is not whether the proposed contract is prohibited by section 10, but it is whether appellees have shown that they have a right under the constitution or treaty to make and carry out the contract." In effect, and by way of historical analogy, this case is similar to a case arising under subdivision 9 of section 1386 of the Civil Code and to cases under the common law where there was a theoretical failure of competent heirs. The present proceeding, provided for by the statute, is only necessary to establish what has already occurred, and is neither necessary as a condition precedent to the working of a forfeiture nor for the purpose of ending a right which has theretofore existed. It is necessary only as a similar proceeding was necessary

under the first kind of escheat, above referred to, at common law.

The purpose of this proceeding is to establish that the defendants never had any title or right to the use and benefit of the lands in question if they are within the inhibitions of this statute. Under the common law aliens could acquire real property and retain title to the same until the sovereign power took away their title thereto. Even that was done because of a theoretical absence of heirs and upon the theory that no one existed who was competent to take, and as an escheat of the first kind above referred to, and not of the second kind by way of forfeiture.

Similar questions to the ones now before us were before the court in *Rose Duplessis* v. *Attorney-General,* reported in Brown's Parliament Case, 415, English Reports, House of Lords, volume 1, Full Reprint at page 658—2 Vesey, 286. In that case, the court said:

''From this order the appellant appealed, and on her behalf it was argued (A. Hume Campbell, E. Starkie, R. Ord, C. Perrot), that every person taking by devise, in law a purchaser; and the incapacity of an alien to hold an estate which he hath purchased, is in the nature of a penalty upon him, or a forfeiture of his interest; and by the known laws of the land, no man can be examined to, nor is bound to disclose, what will subject him to a penalty or forfeiture. That his Majesty having no title or estate in the premises, at the time the information in the Exchequer was exhibited, no act to be done by the Court could give him any estate therein; and therefore the information was premature, and the order for overruling the demurrer ought for these reasons to be reversed.

''On behalf of the Crown it was contended (D. Ryder, T. Bootle), that by the known law of the land, no alien born can take by grant, devise, or other purchase, any freehold, or chattels real, for his own benefit; but can and does, in such cases, take for the benefit of the Crown. That the known method of recovering such estates for the Crown, is by a commission under the great seal to inquire into the facts; and on the inquest finding them, to seize the estate into the King's hands. And, that in order to prove the facts on which it is founded, the King has the same right to a discovery by the assistance of a Court of Equity, as

the subject has, and founded on the same principle of justice, viz. that it is in general against conscience for any one to enjoy the property of another by concealing his right.''

In discussing the matter, the court said: ''The exception is admitted, but is not applicable to the present case. Here is no crime, unless the being born in a foreign dominion be so; and there can be no punishment where there is no guilt, no command neglected, no prohibition broken. Here is no act of parliament to impute it as a crime, with respect to the public; no prohibition, no condition annexed to a gift, to impute it as a contravention of the private law of the donor. Here is no loss, no forfeiture, no right to be divested; for the appellant took nothing originally, but for the benefit of the Crown; . . . ''

The court's conclusion is thus set forth: ''After hearing counsel on this appeal, the following question was put to the judges, viz. 'Whether the legal disability of an alien to hold lands, be a penalty or forfeiture?' And the Lord Chief Justice of the Common Pleas having delivered the opinion of the judges in the negative, it was thereupon ordered and adjudged, that the appeal should be dismissed, and the order of the Court of Exchequer therein complained of, affirmed. (Jour. vol. 28, p. 49.)''

How, then, can it be said that under our statute the enforcing of the escheat is by way of forfeiture, making the proceeding criminal in substance, when no right has ever been vested in an ineligible alien, when the purported transfer conveyed no title or interest to him, and when no infraction of the criminal law is involved? The proceeding is neither to punish for crime nor to forfeit a right previously existing, but is to enforce a rule of property and to place the real property involved in hands competent to hold it and in a proper channel of alienation. The right of the state to limit the ownership, use, occupancy and benefit of agricultural lands to citizens and those eligible to become citizens has been many times upheld and the portions of this particular act which are here involved, are merely for the purpose of enforcing that right. They are neither criminal in substance nor do they involve penalties or forfeitures for offenses against the law.

In such a situation, the statute not only provides the procedure to be followed, but fixes it as that of a civil case. The statute provides that such a proceeding as this shall be instituted ''to have the escheat of such real property adjudged and enforced in the manner provided by section four hundred seventy-four of the Political Code and title eight, part three of the Code of Civil Procedure.'' That title of the Code of Civil Procedure contains the following provision: ''But if any person appears and denies the title set up by the state, or traverses any material fact set forth in the information, the issue of fact must be tried as issues of fact are tried in civil actions.'' We think that this proceeding is neither criminal in substance nor that it involves such a forfeiture as is declared in *Boyd* v. *United States, supra,* to be essentially a forfeiture for crime, and so falling within the constitutional provision that a person may not be compelled to testify against himself. There is no criminal intent involved here. The land escheats to the state upon certain conditions but regardless of the intentions of the parties involved. These defendants could not have been indicted for anything involved in this action. The making of such a deed or the acquiring of any such interest as is here involved is not made a crime under the statute. The title to the property in question will not be forfeited by any decree which might be entered, but such decree can only establish that title passed to the state when the attempted conveyance took place. Such a situation is neither criminal nor *quasi* criminal, since it seeks to forfeit nothing, but seeks only to declare a situation that previously existed.

For the reasons given, we think the court erred in refusing to permit the examination of the defendants under section 2055 of the Code of Civil Procedure.

The point is also urged by the appellant that the court erred in refusing to receive in evidence the depositions of several witnesses. It developed that these depositions were taken in accordance with the provisions of the Code of Civil Procedure and not in accordance with the requirements of the Penal Code for the taking of depositions in a criminal case. In particular, it appeared that the depositions were not taken in accordance with section 13 of article I of the Constitution of California, which provides that depositions to be used in a criminal prosecution shall be

taken in the presence of the party accused. While these depositions were taken in the presence of counsel for the defendants, the provision of the Constitution just referred to was not complied with. Upon that ground and in accordance with its conclusion that this proceeding is criminal in substance, the trial court refused to allow the plaintiff to use the depositions. The correctness of this ruling depends upon the answer to the question we have heretofore been considering, and the decision of the point now raised naturally follows the other.

■ The next point raised is that the court erred in refusing to allow a witness to testify as to a conversation with certain of the defendants alleged to be of the Japanese race and ineligible to citizenship, and as to certain declarations and admissions by them made. Before objection was made, this witness testified that in a conversation with one of these defendants in reply to a question as to how he was working the land, this defendant stated that he was receiving half of the crop and a salary of $200 a month. Thereupon, the answer was stricken out for the purpose of permitting an objection. The objection was then made that no testimony could be received as to any declarations or admissions on the part of the defendants at that stage of the case, for the reason that the *corpus delicti* had not then been established. This objection was sustained, the court stating: "Up to this moment there is no evidence before the Court at all of the foreign nationality of any of these defendants that I know of. There is evidence that they are of the Japanese race." If we are correct in our conclusion that this is not a criminal proceeding, this ruling was erroneous.

■ Even if this were held to be a proceeding of a criminal nature, we think the same result obtains. At the time this evidence was offered, the plaintiff had proved that the lands in question were agricultural in character; that the land had been conveyed to the defendant Nakamura; that the other defendants, alleged to be of the Japanese race and ineligible to citizenship, were occupying the land, and had built five houses thereon, having themselves paid for the lumber; and that they had purchased and paid for seed, and were farming the land. The complaint alleged that they were aliens, subjects of the Emperor of Japan and ineligible to citizenship in the United States, and these

defendants had offered no proof to the contrary. While it is somewhat difficult to tell what the *corpus delicti* is, if this is to be considered a criminal proceeding, we think this evidence, with the presumptions that apply (see *People* v. *Osaki,* 209 Cal. 169 [286 Pac. 1025]), would in any event be sufficient to furnish such proof of the *corpus delicti* as is necessary under our decisions, as a foundation for the admission of statements and admissions on the part of the defendants involved.

■ The last point raised is that the court erred in denying to the plaintiff the benefit of the presumptions created by sections 9a and 9b of the Alien Land Act as adopted in 1927 (Stats. 1927, p. 880), and the shifting of the burden of proof as provided for under section 1983 of the Code of Civil Procedure, as adopted in 1927 (Stats. 1927, p. 434). At the time this action was tried, the case of *People* v. *Osaki, supra,* had been reversed by the District Court of Appeal, but had not been decided by the Supreme Court. Largely on the authority of the opinion of the District Court of Appeal in reversing that case, the trial court held that the provisions of sections 9a and 9b of the Alien Land Act, as adopted in 1927, were in conflict with the due process clause and the equal protection clause of the fourteenth amendment to the federal Constitution. Subsequently the case of *People* v. *Osaki, supra,* was affirmed by the Supreme Court, it being specifically held that the provisions of these amendments were not in conflict with the due process clause of the fourteenth amendment to the Constitution of the United States. The respondents now contend that these amendments to the Alien Land Act are unconstitutional as violating the equal protection clause of the fourteenth amendment to the federal Constitution. The only argument presented is that these amendments are discriminatory in that a citizen who is of one color and appearance is forced to establish his citizenship, while another citizen who happens to be of a different color or possessed of different features is not required to make such proof.

In the first place, we see nothing discriminatory in the amendments complained of. The rule of evidence created by these sections applies to all persons, citizens, eligible aliens and noneligible aliens alike. Whatever his status,

any defendant must proceed to overcome any *prima facie* case that may be made out by meeting the conditions of the statute. The mere fact that some defendants may not, because of the facts, be able to overcome such a *prima facie* case against them is not controlling.

Not only do the provisions of these amendments apply equally to all persons, including citizens of this country, but the classification of persons, ultimately involved through the operation of these amendments, is a reasonable and natural one. In the case of *People* v. *Morrison* (*post,* p. 282 [13 Pac. (2d) 800]), this day decided, we have so held upon reasoning which need not be here repeated and upon the authority of such cases as *Truax* v. *Corrigan,* 257 U. S. 312 [27 A. L. R. 375, 66 L. Ed. 254, 42 Sup. Ct. Rep. 312], *Terrace* v. *Thompson,* 263 U. S. 197 [68 L. Ed. 255, 44 Sup. Ct. Rep. 15], *Porterfield* v. *Webb,* 263 U. S. 225 [68 L. Ed. 278, 44 Sup. Ct. Rep. 21], and *Cockrill* v. *People of the State of California,* 268 U. S. 258 [69 L. Ed. 944, 45 Sup. Ct. Rep. 490].

In our opinion sections 9a and 9b of the act under consideration are not in conflict with the equal protection clause of section 1 of the fourteenth amendment to the Constitution of the United States.

For the reasons given, the judgment appealed from is reversed and the cause remanded for a new trial.

Marks, J., and Jennings, J., concurred.