## TOYOSABURO KOREMATSU v. UNITED STATES.
### No. 10248.

Circuit Court of Appeals, Ninth Circuit.

Dec. 2, 1943.

Rehearing Denied Jan. 7, 1944.

Writ of Certiorari Granted Mar. 27, 1943.

See 64 S.Ct. 786.

Wayne M. Collins, of San Francisco, Cal., for appellant.

Charles Fahy, Director, War Division, Department of Justice, Edward J. Ennis, Head, Alien Enemy Control Unit, Department of Justice, John L. Burling, Nanette Dembitz, and Leo Gitlin, Attys., War Division, Department of Justice, all of Washington, D. C., Charles Burdell, Sp. Asst. to the Atty. Gen., Frank J. Hennessy, U. S. Atty., and A. J. Zirpoli, Asst., U. S. Atty., both of San Francisco, Cal., for appellee.

Robert W. Kenney, Atty. Gen., amicus curiae, for State of California.

Before WILBUR, GARRECHT, DENMAN, MATHEWS, HANEY, STEPHENS, and HEALY, Circuit Judges.

WILBUR, Circuit Judge.

Appellant was convicted of, and placed on probation for five years for, the offense of remaining in that portion of Military Area No. 1, covered by Civilian Exclusion Order No. 34 of the Commanding General, J. L. DeWitt, issued May 3, 1942, in which all persons of Japanese ancestry are excluded from, and not permitted to remain in, the City of San Leandro, County of Alameda, State of California, after 12 o'clock noon, P.W.T., May 9, 1942. The defendant appealed.

The government moved to dismiss the appeal on the ground that the probationary order was not a final order, and hence was not appealable. Owing to a diversity of opinion among the Circuit Courts of Appeal, we certified to the Supreme Court the question of whether or not this court had jurisdiction of the appeal from the order placing the appellant on probation prior to sentence. The Supreme Court on the 1st day of June, 1943, answered that question in the affirmative, Korematsu v. United States, 319 U.S. 432, 63 S.Ct. 1124. Consequently the motion to dismiss is denied.

Appellant is a native born citizen of the United States of America of Japanese ancestry and claims that the proclamation violated by him was void.

This case was argued with two companion cases, both of which were subsequently certified to, and decided by, the Supreme Court on June 21, 1943, entitled Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774, and Yasui v. United States, 320 U.S. 115, 63 S.Ct. 1392, 87 L.Ed. 1793. These decisions involve the portions of the proclamation of General DeWitt imposing curfew restrictions upon Japanese citizens of the United States of Japanese ancestry. The Supreme

Court held the curfew restrictions valid. The Supreme Court did not expressly pass upon the validity of the evacuation order which is involved in the case at bar. However, the Supreme Court held that under the Constitution the government of the United States, in prosecuting a war, has power to do all that is necessary to the successful prosecution of a war although the exercise of those powers temporarily infringe some of the inherent rights and liberties of individual citizens which are recognized and guaranteed by the Constitution.[1] We are of the opinion that this principle, thus decided, so clearly sustains the validity of the proclamation for evacuation, which is here involved, that it is not necessary to labor the point.

The constitutional questions concerning the authority of Congress and of the President and his subordinate, Lieutenant General DeWitt, and questions of discrimination because of race or ancestry raised by the appellant were also considered and decided by the Supreme Court contrary to contentions of the appellant, and for that reason these questions require no further elaboration by this court.[2]

Judgment affirmed.

---

[1] The Supreme Court, speaking through Chief Justice Stone, in Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 1382, 87 L.Ed. 1774, said, "* * * The war power of the national government is 'the power to wage war successfully'. See Charles Evans Hughes, War Powers Under the Constitution, 42 A.B.A.Rep. 232, 238. It extends to every matter and activity so related to war as substantially to affect its conduct and progress. The power is not restricted to the winning of victories in the field and the repulse of enemy forces. It embraces every phase of the national defense, including the protection of war materials and the members of the armed forces from injury and from the dangers which attend the rise, prosecution and progress of war. Prize Cases, [infra]; Miller v. United States, 11 Wall 268, 303–314, 20 L.Ed. 135; Stewart v. Kahn, 11 Wall 493, 506–507, 20 L.Ed. 176; Selective Draft Law Cases (Arver v. United States), 245 U.S. 366, 38 S.Ct. 159, 62 L.Ed. 349, L.R.A.1918C, 361, Ann.Cas. 1918B, 856; McKinley v. United States, 249 U.S. 397, 39 S.Ct. 324, 63 L.Ed. 668; United States v. Macintosh, 283 U.S. 605, 622, 623, 51 S.Ct. 570, 574, 75 L.Ed. 1302. Since the Constitution commits to the Executive and to Congress the exercise of the war power in all the vicissitudes and conditions of warfare, it has necessarily given them wide scope for the exercise of judgment and discretion in determining the nature and extent of the threatened injury or danger and in the selection of the means for resisting it. Ex parte Quirin, supra, [317 U.S. 1] 28, 29, 63 S.Ct. 2, 87 L.Ed. ——; cf. Prize Cases, [infra], 2 Black 670, 17 L.Ed. 459; Martin v. Mott, 12 Wheat. 19, 29, 6 L.Ed. 537. Where, as they did here, the conditions call for the exercise of judgment and discretion and for the choice of means by those branches of the Government on which the Constitution has placed the responsibility of war making, it is not for any court to sit in review of the wisdom of their action or substitute its judgment for theirs.

"* * * If it was an appropriate exercise of the war power its validity is not impaired because it has restricted the citizen's liberty. Like every military control of the population of a dangerous zone in war time, it necessarily involves some infringement of individual liberty, just as does the police establishment of fire lines during a fire, or the confinement of people to their houses during an air raid alarm—neither of which could be thought to be an infringement of constitutional right."

[2] Kiyoshi Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 1381, 87 L. Ed. 1774: "* * * The conclusion is inescapable that Congress, by the Act of March 21, 1942 [18 U.S.C.A. § 97a], ratified and confirmed Executive Order No. 9066. Prize Cases (The Amy Warwick), 2 Black 635, 671, 17 L.Ed. 459; Hamilton v. Dillin, 21 Wall. 73, 96, 97, 22 L.Ed. 528; United States v. Heinszen & Co., 206 U.S. 370, 382–384, 27 S.Ct. 742, 51 L.Ed. 1098, 11 Ann.Cas. 688; Tiaco v. Forbes, 228 U.S. 549, 556, 33 S.Ct. 585, 57 L.Ed. 960; Isbrandtsen-Moller Co. v. United States, 300 U.S. 139, 146–148, 57 S.Ct. 407, 81 L.Ed. 562; Swayne & Hoyt, Ltd., v. United States, 300 U.S. 297, 300–303, 57 S.Ct. 478, 81 L.Ed. 659; Mason Co. v. Tax Comm., 302 U.S. 186, 208, 58 S.Ct. 233, 82 L.Ed. 187. And so far as it lawfully could, Congress authorized and implemented such curfew orders as the commanding officer should promulgate pursuant to the Executive Order of the President. The question then is not one of Congressional power to delegate to the President the promulgation of the Executive Order, but whether, acting in cooperation, Congress and the Executive have constitutional authority to impose the curfew restriction here complained of. We must consider also whether, acting together, Congress and the Executive could leave it to the designated military commander to appraise the

DENMAN, Circuit Judge (concurring in the result, but dissenting from the grounds of the majority opinion).

It is with regret that I find myself in profound disagreement with a majority of my colleagues in their treatment of the claims of unconstitutionality and other illegalities, later considered herein, of General DeWitt's order to Korematsu. Korematsu is a fellow citizen, who, because happening to have a common ancestry with the people under the dominion of the Japanese Government, with which we are at war after decades of peaceful intercourse, was required to report for imprisonment in a military assembly stockade to await deportation for further such imprisonment.

Along with him are 70,000 American citizens—men, women and children—who, under similar orders, have been torn from their homes, farms and places of business to be imprisoned together in large groups, first in barbed wire stockades called Assembly Centers, then, after deportation, in distant places under military guard. As Justice Murphy states in his concurring opinion in Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 1389, 1390, 87 L.Ed. 1774, their treatment is not unlike that of Hitler in so confining the Jews in his stockades.

The order here under consideration is the initial step in a unit succession of orders, held by the Supreme Court to be a "single program," (cf. infra) ultimately leading to such a cruel consummation. The court properly should take judicial notice of the fact that the result is that such forcible confinement of American citizens made Poston the third largest city in Arizona; Manzanar the second largest city in California east of the Sierras; and a large town on the Southern Pacific Railway and the National Highway between San Francisco and San Mateo of the assembly stockade at Tanforan. I cannot agree that taking judicial notice of these facts, known to the world, is "lending aid and comfort to the enemy," and hence that Korematsu's contentions be suppressed.

In this conspicuous appeal of such a member of one of America's minority groups, the opinion of this court disposes of Korematsu's major contentions without their mention, much less their consideration.[1] Outstanding is the avoidance of the question of imprisonment and deportation. It is buried in the euphemism "evacuation," without suggestion of its forced character or its accomplishment by compulsory confinement.

The opinion of this court concerning such unmentioned imprisonment for deportation is based solely upon an interpretation of the decision of the Supreme Court in Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774, on the validity of a *curfew* order. That order is treated by that Court as analogous to the control of civilians by lines about a burning building, established by the police or firemen, or the requirement of citizens to remain indoors during the brief period of a blackout.

In so disposing of his case, Korematsu has received a treatment similar to that accorded Hirabayashi in connection with our decision to refuse to decide the questions he brought before us and their certification to the Supreme Court without stating various of his contentions nor the facts on which he relied.[1a]

Americans are to face a peace table at which our prestige and power will rest upon the belief of a world questioning

---

relevant conditions and on the basis of that appraisal to say whether, under the circumstances, the time and place were appropriate for the promulgation of the curfew order and whether the order itself was an appropriate means of carrying out the Executive Order for the 'protection against espionage and against sabotage' to national defense materials, premises and utilities. For reasons presently to be stated, we concluded that it was within the constitutional power of Congress and the executive arm of the Government to prescribe this curfew order for the period under consideration and that its promulgation by the military commander involved no unlawful delegation of legislative power."

[1] In Anglo Saxon law the right of a litigant to a reasoned opinion considering his contentions on issues raised was recogized at least as early as 1588 by Edmund Anderson on Elizabeth's Queen's Bench. See footnote 1b, infra. Today it is codified in the nineteenth canon of the judicial ethics of the American Bar Association. 62 Rep. Am.BarAssn. 1937, p. 1129.

[1a] Cf. My dissent in Hirabayashi v. United States, No. 10,308 our docket, filed March 28, 1943, which, because unreported and containing a consideration of facts pertinent to this concurring and dissenting opinion, is attached as **Exhibit A** and made a part hereof.

Caucasian sincerity, a world which includes a billion Asiatics. There no one will shut his eyes to the Postons, Manzanars and Tanforans. One of the questions will be what sort of judicial consideration do minority groups of American citizens receive from the courts of a claimed democracy.

A. *The Supreme Court refused to consider the validity of the orders to report for imprisonment.* This case was consolidated for argument with that of Hirabayashi v. United States, No. 10,308, on the question of the validity of General DeWitt's orders. For the reason, stated in its certificate in the Hirabayashi case, that the question arising from such a measure as mass imprisonment to prevent espionage and sabotage was "difficult" and for which "this court knows of no decision" as a precedent,[1b] a majority of this court avoided its decision. Cf. the last four paragraphs of my attached dissent. Instead, this court certified to the Supreme Court in that case the following question:

"1. Was Lt. Gen. DeWitt's Civilian Exclusion Order No. 57 of May 10, 1942 *excluding* all persons of Japanese ancestry, *including American citizens of Japanese ancestry,* from and after 12 o'clock noon, May 16, 1942, from a particular area in Seattle, Washington within Military Area No. 1 established by General DeWitt's Proclamation No. 1 of March 2, 1942 and *requiring* a responsible member of each family, and each individual living alone, affected by the order to *report* on May 11 or 12, 1942, *to the Civil Control Station*

*in the said area in connection with said exclusion,* a constitutional exercise of the war power of the President derived from the Constitution and statutes of the United States?" (Emphasis supplied.)

The Supreme Court expressly refused to decide that question. Hirabayashi's indictment also charged a violation of an order entirely different from that one of the series of deportation orders with which the above quotation is concerned. What is passed upon is the validity of General DeWitt's Proclamation No. 3 of March 23, 1942, imposing a curfew, not only on persons of Japanese descent but, on all enemy aliens for whom no general exclusion order has ever been made. It required them to remain in their places of residence between the hours of 8 p.m. and 6 a.m.[2]

It permitted such movement of all these aliens within the curfew hours as pertained to their *voluntary* evacuation of the coastal military areas. This court's certificate in the Hirabayashi case certified the question of the validity of the curfew order, also because it found the question difficult and without precedent.

Concerning the question of the curfew order, as distinguished from the deportation order, the Supreme Court said, "Our investigation here does not go beyond the inquiry whether, in the light of all the relevant circumstances preceding and attending their promulgation, the challenged orders and statute afforded a reasonable basis for the action taken in imposing the curfew. * * * It is unnecessary to con-

---

[1b] Resceit. The case of the resceit [intervention] was moved again, and Shuttleworth said, that he cannot be resceived because he is named in the writ, and said, that he had searched all the books, and there is not one case where he which is named in the writ, may be resceived.

"Anderson. What of that? shall not we give judgment because it is not adjudged in the bookes before? wee will give judgement according to reason, and if there bee no reason in the bookes, I will not regard them." (Emphasis supplied.) English Reports, 75; King's Bench Book 4, 1019; Gouldsborough, 96. De Term. Trinitat. An. Reg. Eliz.

Judge Stephen's opinion states that all the judges were agreed on the answer to the question so certified.

[2] "1. From and after 6:00 A.M., March 27, 1942, all alien Japanese, all alien Germans, all alien Italians, and all persons of Japanese ancestry residing or being with-

in the geographical limits of Military Area No. 1, shall be within their place of residence between the hours of 8:00 P.M. and 6:00 A.M., which period is hereinafter referred to as the hours of curfew."

"3. Nothing in paragraph 2 shall be construed to prohibit any of the above specified persons from visiting the nearest United States Post Office, United States Employment Service Office, or office operated or maintained by the Wartime Civil Control Administration, for the purpose of transacting any business or the making of any arrangements reasonably necessary to accomplish evacuation; nor be construed to prohibit travel under duly issued change of residence notice and travel permit provided for in paragraph 5 of Public Proclamations Numbers 1 and 2. Travel performed in [voluntary] change of residence to a place outside the prohibited and restricted areas may be performed without regard to curfew hours."

sider whether or to what extent such findings would support *orders differing from the curfew order."* (Emphasis supplied.)

The Supreme Court found a precedent. As seen, it assimilated the curfew order to the fire lines and brief blackout restrictions. Here is no resemblance to the orders leading to the imprisonment of men, women and children en masse in assembly center stockades for deportation. These are orders "differing from the curfew order" upon which the Supreme Court declined to pass.

Hence I dissent from the description of the offense in the first paragraph of the court's opinion that it consisted merely "of remaining in that portion of Military Order No. 1 covered by * * * Exclusion Order 34 * * * in which all persons of Japanese ancestry are excluded from, and not permitted to remain in, the City of San Leandro, County of Alameda, State of California, after 12:00 o'clock noon, P. W. T., May 9, 1942."

San Leandro is a town of small area and, for anything the majority opinion shows, all Korematsu had to do to satisfy Order 34 was to walk for a few minutes and pass out of the town's boundaries. The analogy with the police fire lines is obvious and if this were all, the opinion properly could say that it is unnecessary further "to labor the point."

Korematsu's contention, in effect, is that his conviction was for the crime of not moving out of San Leandro *into imprisonment in an assembly center.* An inspection of the series of orders affecting him shows his position to be well taken. *These orders at once required him not to leave and not to remain in the area.* His sole alternative was imprisonment.

B. *The facts, and the deportation and imprisonment orders.* Fred Korematsu, born in California of Japanese parents, was educated in California grammar schools, high school and junior college, with white children. He grew up under the conditions of a Mongolian minority in a Caucasian majority, with its tragic contrast between the primary and high school teachings of freedom and equality, and, in his later social and economic life, the limitation and denial of what had been taught him by his white instructors, more fully considered in my attached dissent of March 28, 1943, in the Hirabayashi case.

There is no showing or suggestion that what Korematsu suffered from the con-

trast between the American teachings of personal liberty and equality and their denial caused any disloyalty. On the contrary, when rejected by his Selective Service Board, he spent $150.00 of his own funds to learn a ship mechanic's trade and thereafter, prior to Pearl Harbor, had been employed in a defense industry.

After that time he had made an unsuccessful attempt to have his features altered by plastic surgery, hoping thereby to escape the discrimination against his minority group of citizens. This attempt is as pathetic as that of another of our minority groups—of those of one-sixteenth negro blood hoping to conceal the fact that they have not "passed over" into general Caucasian social intercourse.

Like all the remaining 70,000 Japanese descended citizens, Korematsu became subject to a series of Proclamations and Executive Orders which "[are] parts of a single program [leading to his imprisonment] and must be judged as such." Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 1387, 87 L.Ed. 1774.

On June 12, 1942, when he was arrested in San Leandro, Korematsu was subject to an order of General DeWitt prohibiting him from leaving Military Area No. 1. On March 27, 1942, Public Proclamation No. 4 was issued finding and ordering,

"It is necessary, in order to provide for the welfare and to insure the orderly evacuation and resettlement of Japanese *voluntarily migrating* from Military Area No. 1, to restrict and regulate such migration" (Emphasis supplied.)

Therefore

"* * * as a matter of military necessity that commencing at 12:— midnight, P.W.T., March 29, 1942, all alien Japanese and persons of Japanese ancestry who are within the limits of Military Area No. 1, be and they are hereby prohibited from leaving that area for any purpose until and to the extent that a future proclamation or order of this headquarters shall so permit or direct."

The words "voluntary migrating" and "evacuation and resettlement" coupled with the words prohibiting him from leaving the limits of Military Area No. 1 seem an evasion of the real purpose of refusing any voluntary departure. The words "evacuation" and "resettlement" mean deportation and imprisonment in a relocation stockade. It was not restrict-

ing and regulating *"voluntary"* migration. It was denying it.

Korematsu was thus prohibited from leaving a military area in California, roughly extending 200 miles westerly from the Sierras to the Pacific and north and south for 600 miles. By a previous Military Proclamation No. 1 he was prohibited from moving from his "habitual residence" therein without filing a "change of residence" notice with his postmaster. He had filed no such notice of change of residence and hence was prohibited from leaving it.

For purposes of the contemplated deportation this Military Area was ordered divided into smaller areas. Korematsu found himself in an area about San Leandro in Alameda County, California. Similar small areas were created throughout the portions of California in Military Area No. 1. Had Korematsu left the San Leandro area, he would have entered another from which he was forbidden to leave.

Then followed Evacuation Order No. 34, with its accompanying directions respecting the deportation casually described, but not set forth, in the first paragraph of the majority opinion. It is as follows:

"Civilian Exclusion Order No. 34

"1. Pursuant to the provisions of Public Proclamations Nos. 1 and 2, this Headquarters, dated March 2, 1942, and March 16, 1942, respectively, it is hereby ordered that from and after 12 o'clock noon, P. W. T., of Saturday, May 9, 1942, all persons of Japanese ancestry, both· alien and non-alien, be excluded from that portion of Military Area No. 1 described as follows:" (Descriptive area including San Leandro.)

"2. A responsible member of each family, and each individual living alone, in the above described area will report between the hours of 8:00 A. M. and 5:00 P. M. Monday, May 4, 1942, or during the same hours on Tuesday, May 5, 1942, to the Civil Control Station located at:

920 - 'C' Street,

Hayward, California.

"3. Any person subject to this order who fails to comply with any of its provisions or published instructions pertaining hereto or who is found in the above area after 12 o'clock noon, P. W. T., of Saturday, May 9, 1942, will be liable to the criminal penalties provided by Public Law No. 503, 77th Congress, approved March 21, 1942."

As seen, that order required Korematsu and all such unmarried citizens and the heads of families of such citizens to report to a Civil Control Station by May 5, 1942, to receive directions for their imprisonment by May 9, 1942, in a stockade called an Assembly Center,· from which the deportation was to be made.

The list of instructions made a part of Order No. 34 reveals the destruction of family life and of long established business relations. They are

"The Following Instructions Must Be Observed:

"1. A responsible member of each family, preferably the head of the family, or the person in whose name most of the property is held, and each individual living alone, will report to the Civil Control Station to receive further instructions. This must be done between 8:00 A. M. and 5:00 P. M. on *Monday, May 4*, 1942, or between 8:00 A. M. and 5:00 P. M. on *Tuesday, May 5, 1942.*

"2. Evacuees must carry with them *on departure for the Assembly Center,* the following property:

"(a) Bedding and linens (no mattress) for each member of the family;

"(b) Toilet articles for each member of the family;

"(c) Extra clothing for each member of the family;

"(d) Sufficient knives, forks, spoons, plates, bowls and cups for each member of the family;

"(e) Essential personal effects for each member of the family.

"All items carried will be securely packaged, tied and plainly marked with the name of the owner and numbered in accordance with instructions obtained at the Civil Control Station. *The size and number of packages is limited to that which can be carried by the individual or family group.*

"3. No pets of any kind will be permitted.

"4. No personal items and no household goods *will be shipped* to the Assembly Center.

"5. The United States Government through its agencies will provide for the storage *at the sole risk of the owner* of the

more substantial household items, such as iceboxes, washing machines, pianos and other heavy furniture. Cooking utensils and other small items will be accepted for storage if crated, packed and plainly marked with the name and address of the owner. *Only one name and address will be used by a given family."* (Emphasis supplied.)

The order is not free of the mean oppressiveness often found in regimentation of minority groups. After the Government had so ordered the stripping of the citizens of their belongings and their imprisonment, they are informed that their prospective warden "will provide for the storage of belongings *at the sole risk of the owner."*

It is apparent that what the disobeyed order actually was bears no resemblance to the order described in the first paragraph of this court's opinion.

C. *Korematsu's contentions.* The Government's counsel contends that orders for such imprisonment were a proper exercise of the discretion of a military commander in such an area a Military District No. 1, with its reasonably anticipated Japanese invasion from the Pacific.

In the course of the hearing, the Government admitted that not one of these 70,000 Japanese descended citizen deportees had filed against him in any federal court of this circuit an indictment or information charging espionage, sabotage or any treasonable act. This admission covered the five months from Pearl Harbor to General DeWitt's deportation order of May 10, 1942. Though in so conceding the fact, Korematsu's position is greatly strengthened, the majority opinion does not mention the admission. It is thus lost to him.

Korematsu argued that, assuming such imprisonment is otherwise valid, the selection of his Mongolian-blooded group for such treatment is so arbitrary and capricious a racial discrimination that it violates the due process clause of the Fifth Amendment. This argument is answered in the detailed consideration of the social and legal relationships of the people of Mongolian blood to the surrounding Caucasian population in the Pacific Coast states in my dissent in the Hirabayashi case. It is finally decided against him in the appeal in that case.

Korematsu contends that the principle established in Ex parte Milligan, 71 U.S. 2, 4 Wall. 2, 18 L.Ed. 281, applies *a fortiori* where no hearing of any kind was provided to establish the disloyalty or military menace of any of the citizens on the way to imprisonment, much less of Korematsu. It is contended that the prospective hanging of Milligan presents no difference in principle from the gross cruelty of the military mass imprisonment and deportation of these citizens. In both cases the civil courts were functioning. In both cases the action of the military was not against soldiers subject to court martial. Neither Milligan's ordered hanging nor Korematsu's imprisonment was the result of a judgment of a civil court.

His position is that if hanging of a civilian is not legal on a military order after court martial, *a fortiori* imprisonment is not legal on a military order without court martial. Also, if, as stated in the Milligan case, Congress cannot give to the military the power to order the hanging of a civilian after a military trial, it cannot give the military the power to order the imprisonment of civilians without any trial at all.

It seems clear to me that a decision on a curfew order likened to police fire lines, does not dispose of Korematsu's contention that the principles of the Milligan case apply to such imprisonment for deportation.

Korematsu also contends that such imprisonment violates the due process clause of the Fifth Amendment and that General DeWitt's orders are "lettres de cachet." Imprisonment without trial is a denial of the due process of the Fifth Amendment and such orders are the equivalent of lettres de cachet so far as the physical effect of the bodies of these citizens is concerned. It would be like the hypocrisy of the phrase "voluntary evacuation" to contend otherwise.

Korematsu further argues that such mass "banishment" is a cruel and unusual punishment in violation of the Eighth Amendment. That it is cruel and unusual need not be further pressed. It is nonetheless a matter for our consideration with reference to the discretionary power of General DeWitt, that the military order causing it may be construed as not the "punishment" contemplated by that amendment.

Korematsu, a shipwelder, further contends that his right to work is property, e.g. Truax v. Raich, 239 U.S. 33, 38, 36 S.Ct. 7, 60 L.Ed. 131, L.R.A.1916D, 545, Ann.Cas.1917B, 283, and that his imprisonment is a deprivation of that property in violation of the due process clause of the Fifth Amendment.

D. *Ex parte Milligan is not controlling, because implicit in its reasoning is the hypothesis that in the absence of actual invasion the slower and more deliberate procedures of the civil courts are a sufficient protection from disloyal citizens lending aid to the enemy; and because the possibility of air invasion covering the state of Indiana in less than two hours was not even "lurking" in the minds of the Justices.*

It was 37 years after the Milligan decision that the Wrights made the first successful flight with a craft heavier than air, and 13 years later that aviation had progressed to military utility.

It was in a world that could not conceive of an invasion faster than by movement on the ground that the Supreme Court held [71 U.S. 127, 4 Wall. 127, 18 L.Ed. 281]:

"Martial law *cannot* arise from a *threatened* invasion. The necessity must be actual and present; the invasion real, such as effectually closes the courts and deposes the civil administration.

"It is difficult to see how the *safety* of the country required martial law in Indiana. If any of her citizens were plotting treason, the power of arrest could secure them, until the government was prepared for their trial, when the courts were open and ready to try them. It was as easy to protect witnesses before a civil as a military tribunal; and as there could be no wish to convict, except on sufficient legal evidence, surely an ordained and established court was better able to judge of this than a military tribunal composed of gentlemen not trained to the profession of the law.

"It follows, from what has been said on this subject, that there are occasions when martial rule can be properly applied. If, in foreign invasion or civil war, the courts are actually closed, and it is impossible to administer criminal justice according to law, *then,* on the theatre of active military operations, where war real-

ly prevails, there is a necessity to furnish a substitute for the civil authority, thus overthrown, to preserve the safety of the army and society; and as no power is left but the military, it is allowed to govern by martial rule until the laws can have their free course. *As necessity creates the rule, so it limits its duration;* for, if this government is continued *after* the courts are reinstated, it is a gross usurpation of power. Martial rule can never exist where the courts are open, and in the proper and unobstructed exercise of their jurisdiction. It is also confined to the locality of actual war." (Emphasis supplied.)

Since "necessity creates the [martial] rule," it is not inconsistent with the principle established in the Milligan case that a threatened air invasion, directed by saboteur signals, which in an hour's time could destroy every federal court house in California, presents the necessity for the substitute of military action against such sabotage for that of civil courts. The question of war necessity now before us could not even "lurk" in the record in the Milligan case.

The extent of the holding of "necessity" in that case is confined by the long established rule that matters not presented and considered by the court and *a fortiori* those beyond its possible consideration, are not there decided. Webster v. Fall, 266 U.S. 507, 511, 45 S.Ct. 148, 69 L.Ed. 411, and cases cited; K.V.O.S., Inc., v. Associated Press, 299 U.S. 269, 270, 57 S.Ct. 197, 81 L.Ed. 183.

E. *General DeWitt's orders purposed for and leading to Korematsu's imprisonment, though violative of specific constitutional rights in the absence of any impending menace, during war and the reasonable expectation of air invasion are within the area of military discretion of those acting under their then paramount constitutional power to wage war.*

Korematsu's stress on his imprisonment as violative of several claimed constitutional rights is pertinent here with reference only to the limits of the control of governmental agencies compelled by some necessity to exercise, for the common safety, a coercion on the individual which otherwise such rights would prohibit.

In the peace time example of the fire lines, it is the existence or likelihood of fire that warrants the exclusion of the citizen from his home or office or ballot box.

No one would question the violation of his constitutional right if, using the presence of a controlled fire in a small detached building, a political police extended its fire lines around a large district of adverse voters and had prevented him from reaching his polling booth.

That Korematsu is entitled to the consideration by this court of the particular facts of his case as supporting the contention that the coercion exceeds the "allowable limits of military discretion," is what I understand to be the law as established in Sterling v. Constantin, 287 U. S. 378, 403, 53 S.Ct. 190, 77 L.Ed. 375. There, where martial law had been declared in Texas, the Supreme Court held certain acts of the Governor to be violative of the Federal Constitution as in excess of his authority under the martial power the declaration had given him. In so ruling the Supreme Court held (287 U. S. at pages 400, 401, 53 S.Ct. at page 196, 77 L.Ed. 375),

"It does not follow from the fact that the executive has this range of discretion, deemed to be a necessary incident of his power to suppress disorder, that every sort of action the Governor may take, no matter how unjustified by the exigency or subversive of private right and the jurisdiction of the courts, otherwise available, is conclusively supported by mere executive fiat. The contrary is well established. *What are the allowable limits of military discretion, and whether or not they have been overstepped in a particular case, are judicial questions.*" (Emphasis supplied.)

I take it that the exercise of the military power of a state is as high a function of government in the territory over which it has jurisdiction as is the exercise of that power by the United States in Military Area No. 1. Sterling v. Constantin so treats the states' military powers and its *ratio decidendi* is supported by Ex parte Milligan, supra; Mitchell v. Harmony, 13 How. 115, 134, 14 L.Ed. 75, and United States v. Russell, 13 Wall. 623, 628, 20 L. Ed. 474, all cases determining limits of the federal military authority. The extraordinary increase during the last decade in the exercise of federal administrative controls cannot be regarded as having changed the states from entities as supreme in their reserved powers as is the Federal Government within its limited grant of powers, to mere agencies of the latter and hence made the Constantin case inapplicable.

By refusing to consider Korematsu's contentions, the majority are treating the Constantin case as if it had been overruled *sub silentio* by the Hirabayashi case. With this I cannot agree. Since the Hirabayashi majority opinion, by its terms, is confined to a curfew order, it required no consideration of the Constantin case. Such a curfew order, considered no more than an exercise of an ordinary police function, is obviously "within the allowable limits of military discretion."

Assume the defense of the Coast had been under the command of some general so uneducated that he was oblivious to (1) the political struggles in Japan of a rising middle class for the creation of a form of democratic government, finally frustrated by assassination by a military group, to whom had been entrusted the education of a greater part of the nation's youth; (2) the fact that *even after the declaration of martial law,* over 75,000 Japanese, both citizen and alien, are freely living their accustomed lives on Oahu around Pearl Harbor and the Oahu military establishments; and (3) the fact that, while now the Chinese are among the most respected and liked of all our minority groups of alien ancestry for their commercial integrity and sense of social responsibility, only sixty years ago, in support of the slogan "The Chinese Must Go," a blind passionate hatred attributed to the Chinese, as a people, the same essential inherited treacherous antagonism to the Caucasian and the same cruel ferocity of the soldiers of some former Chinese "War Lords" and of the Tong "hatchet men," as that with which other ignorant citizens, often played upon by the lower politicians, now characterize all the Japanese people.

Let us then assume that such a general had made findings and orders somewhat as follows:

"Whereas, I find that a Jap is a Jap, and that all Japanese descended people, male and female, are alike. They by heredity worship a sun emperor who is destined to conquer and rule all the people of the world. No education in American schools can eradicate this inherent instinct. No American environment can create any loyalty in any Jap to our flag. To America they will always be treacherous and be-

cause of a cruel and fanatical courage each is a constant threat of sabotage and espionage;

"Now, therefore, it is ordered

"(1) That all adult males of Japanese descent in Military Area No. 1 be imprisoned in a barbed wire stockade, each with an Oregon boot of ten pounds weight attached to his right leg, and

"(2) That all adult females be so confined and each chained by the wrists, the chains light enough in weight and sufficient in length to allow them to prepare the food, do the laundering and other necessary services for all the prisoners and to care for their younger offspring."

Such findings and orders, inconceivable in any sane American commander such as General DeWitt, are postulated as an extreme exercise of military action to prevent espionage and sabotage. Under the principles established in Sterling v. Constantin, supra, we would not only consider their constitutionality but it is strongly arguable, we would not convict Japanese descended citizens for disobeying them.

It is true that the majority opinion in the Hirabayashi case, 320 U.S. 81, 63 S. Ct. at page 1382, 87 L.Ed. 1774, states,

"Where, as they did here, the conditions call for the exercise of judgment and discretion and for the choice of means by those branches of the Government on which the Constitution has placed the responsibility of warmaking, it is not for any court to sit in review of the wisdom of their action or substitute its judgment for theirs."

This I take to refer to "judgment," "discretion" and "wisdom" within the rational area of the necessities of war. I reject the concept that Japanese so treated would be compelled to remain in their chains, without the right to present to "any court" the contention that the order and its execution were unwarrantably "subversive of private right" within the rule of Sterling v. Constantin, supra.

Nor do I regard Justice Douglas' concurring statement (320 U.S. 81, 63 S.Ct. at page 1388, 87 L.Ed. 1774) that "Where the orders under the present Act have some relation to 'protection against espionage and against sabotage,' our task is at an end," as meaning that any order, no matter how cruel and unnecessarily oppressive, must be upheld by the court merely because it has *"some* relation" to the military object to be attained.

For illustration, assume similar Congressional legislation with a set of military orders for the taking of property as that for the mass imprisonments and deportations of these 70,000 people. Then assume a need for blankets for soldiers for Alaska, where there is a landing of Japanese troops. There are sufficient blankets in a warehouse at Oakland, California, only six miles away, but, as reported of the German officers in Norway and other occupied countries, our officers seize them at night from the beds of men, women and children in nearer-by homes in San Francisco. These seized blankets have not only *"some* relation" to a military need, but a *direct* relation "to protection" against the Alaska cold to be endured there by our soldiers.

I take it that Justice Douglas' words are not to be construed to mean that, in a prosecution in a civil court of a father resisting the taking of the blankets from his wife or children, the court must regard as stating no defense his offered evidence showing such taking and claiming it a violation of the Fifth Amendment. Yet such taking is no more "subversive of private rights" than these mass imprisonments and deportations. Under Sterling v. Constantin, supra, the difference is in the absence of military necessity, with the blankets easily available in Oakland.

No doubt on certiorari the Supreme Court will remove the doubt raised by these phrases, which the majority opinion of this court well may be taken to have resolved in favor of an uncontrolled military autocracy.

In so far as concerns the permitted area of "subversion of private right," General DeWitt's orders lie between the comparatively innocuous curfew restriction and such chaining of the Japanese descended citizens. Whether here there has been such subversion well may be regarded as a border-line question. The nearest analogy to General DeWitt's stockade confinement is the long-established and accepted process of quarantining of both the persons having such a dangerous and contagious disease as small-pox and those exposed to the disease, the latter until shown free of it after the period of its development has expired.

In my dissent in the Hirabayashi case are stated the several grounds of fact from which General DeWitt reasonably could infer that he could not speedily segregate from the Japanese communities in Military Area No. 1 those persons likely to engage in sabotage and espionage, and hence a necessity that all must be imprisoned and deported.[3] Nearly all of them, though omitted from this court's certificate, are restated in the Supreme Court opinion in that case, but the one most strongly appealing to one living in the neighborhood of these communities and having dealings with their commercial houses is omitted. It is expressed in that dissent as

"Because of such limitation of social intercourse, people do not become familiar with the Mongolian physiognomy. The uniform yellow skin and, on first impression, a uniformity of facial structure, makes 'all Chinks and Japs look alike to me', a common colloquialism. Hence arises a difficulty for General DeWitt's soldiers or the federal civil officers in picking out from the other Japanese crowded together in the segregated districts, and including men educated in Japan, the suspected saboteurs or spies or fugitives from a commando landing or hiding parachutists. Also the difficulty of identification of Japanese of known or suspected enemy aid, by descriptions telegraphed or written to white enforcement offices."

War always causes some cruel treatment of the innocent, the more so global war. It is customary for the Supreme and other federal courts to comment, where claims of oppression arising from Congressional legislation are not regarded as making the legislation invalid, that the claimant should look to Congress for his remedy. It is within that practice to state that where, as a war necessity, such wrongs are deliberately committed upon its citizens by a civilized nation, ordinary decent standards require that compensation must be made as in the case of our broken treaties with another Mongoloid group, the American Indians. One properly may hope that it will not be delayed (because it involves the admission of the wrong) until it is given to descendants many generations removed from their wronged ancestors.

Giving due weight to Korematsu's argument of the extent of the subversion of his private rights, constitutional and other,

---

[3] I note Judge Stephens' discussion of Admiral Perry's invasion of Japan which, though not offered as such, has a logical relationship to General DeWitt's orders.

Judge Stephens nowhere states that Japan's laws forbade any foreign vessels entering Japan and her known isolationist policy. In international law it was her right to eject Perry's fleet by force and if she had the power so to act it was her duty to use it to enforce her laws. Perry's invasion invited the use of such force.

In this situation, our President's instructions to Perry when he had brought his fleet into the harbor of Yedo (now Tokyo) —that is, invaded in force forbidden waters—were "Make no use of force, *except* in the last resort for defence, if attacked, and self-preservation."

I do not agree that intelligent Japanese students are required to regard Perry's entry as not an act of war. Rather one would think it not illogical for them to make the inference that, having invited armed resistance, the instructions "Make no use of force, except in the last resort' for defence, if attacked," say to Perry, "Having invaded Japan with our Navy, in defiance of their laws, you are to fight them if they perform their obligation to enforce their laws." This is not offered as my inference, but as a not illogical inference of an intelligent Japanese and a not illogical basis for Japan's claim that we invaded her without declaring war.

They well might ask, "What would Americans feel in the same situation?" Assume we passed laws refusing the admission of Japanese vessels and planes into the continental United States. Then assume that Japan, in defiance of such laws, entered San Francisco Bay with a fleet of cruisers, and landed on our fields a fleet of war planes, for a peaceful discussion by their admiral of the repeal of such laws, the admiral having the same instructions from Hirohito as Perry had from the President.

My own opinion is that however beneficent we may claim our purposes, Perry "let the genie out of the bottle." It made, at least, a causa sine quo non for Japan's seizure of South Western Asia, the Philippines and other islands, and one historic basis for the hatred of the white man.

I regard a people, rightly or wrongly, taught for decades that they have historic grounds for hating the white race the more likely to have among their descendants who are our citizens, again suffering because not white, the degrading discriminations described by the Supreme Court in the Hirabayashi case, men who may be dangerously disloyal. Or, at least, that General DeWitt properly could so infer, in justification for his deportation orders.

and of the degrading conditions imposed upon him and like citizens, it cannot be said that, considering the martial necessity arising from the danger of espionage and sabotage, General DeWitt's orders exceed the area of discretionary powers legally to be exercised by him in Military Area No. 1.

## EXHIBIT A

*In the United States Circuit Court of Appeals for the Ninth Circuit*

GORDON KIYOSHI HIRABA-YASHI,
        *Appellant,*
    vs.
UNITED STATES OF AMERICA,
        *Appellee.*

No. 10,308
March 28, 1943

Upon Appeal from the District Court of the United States for the Western District of Washington, Northern Division.

Opinion of DENMAN, Circuit Judge, on his dissent from the certification of questions to the Supreme Court, and from the omission of facts therefrom.

DENMAN, Circuit Judge (dissenting).

One, at least, of my associates seems of the opinion that it is not within the power of a participating member of the court to dissent from the decision of the court that it certify questions to the Supreme Court under section 239 of the Judicial Code, 28 U.S.C.A. § 346, or from the content of the certificate. With this contention I do not agree.

Certification is a judicial action vitally affecting the litigants, since it transfers from one tribunal to another the forum of adjudication of the questions certified. One of the primary issues argued here is one of classification of Japanese descended citizens from other citizens descended from aliens of countries with which we are at war. The validity of such a classification is entirely a question of fact largely in the ill-defined area of judicial notice. The Supreme Court in civil cases takes judicial notice of the laws of the several states, yet believes justice is better served in most such cases if such questions are left to the respective circuit

courts of appeals. If this be true of civil cases, it is true *a fortiori* of such criminal cases as those involving psychological facts which, in my opinion, alone could warrant the discriminating cruelty with which these Mongoloid people have been treated.

Entirely apart from the question of costs of a second presentation to a distant tribunal, these unfortunate persons (if the certificate is granted) will have the decision of these questions of fact removed from the circuit court of appeals which is best qualified to find them. I dissent from a certification which denies to Hirabayashi* the exercise of our special knowledge of the psychology of these deported citizens. In this connection, Supreme Court rule 37(1) provides that our "certificate shall contain a statement of the nature of the cause and *of the facts* on which such question or proposition of law arises." (Emphasis supplied).

If it be unusual for a judge of a court in which he is a participant to dissent from his associates on the matter of a certification, the occasion is even more unusual.

Under the threat of penitentiary sentences to these 70,000 American citizens who have relied on the right they believe the Constitution gives them, we are driving from their homes to internment camps, not men alone, as with the deportation of the Dutch by the Germans, but their wives and children, without giving the latter the choice to remain in their homes. We are destroying their businesses, in effect, as if such citizens were enemy aliens. The destruction of their business connections means for many that they will not be able to return to their native areas; in effect, as were the French Canadians so taken to Louisiana.

While none of the appellants had yet been interned, the deportation order was but the initial step in a single plan ending in imprisonment in barb wired enclosures under military guard. Descended from Eastern Asiatics, they have been imprisoned as the Germans imprisoned the Western Asiatic descended Jews.

The first omission of fact from the certificate, which I regard as prejudicial to the appellants, is the admission by the Government, at the hearing here, that not

---

* This certification omits the customary statement of doubt or disagreement as to our own answers to its questions, from which one of the inferences is that we have no such doubt.

one of these 70,000 Japanese descended citizen deportees had filed against him in any federal court of this circuit an indictment or information charging espionage, sabotage or any treasonable act. This admission covered the five months from Pearl Harbor to General DeWitt's deportation order of May 10, 1942. I dissent from the absence of such an admission of fact from the certificate.

I also dissent from the omission from the certificate of the following facts concerning the issue of a "present danger of immediate evil [sabotage and espionage] [1] or an intent to bring it about,"[2] which would warrant General DeWitt's order, in effect, of deportation of citizens without trial for their immediate imprisonment. They are facts from which pertinent inferences may be drawn regarding the psychologic impulses and impelling convictions and personal loyalties and sympathies of a yellow Mongoloid body of citizens living in a predominantly Caucasian society and subject to legal and social compulsions because of race and color.

It is a matter of common knowledge to people of detached thinking in Pacific Coast communities, formerly living among these deported citizens, that their Mongoloid features and yellow skins have among them many persons of the same high spirit, intellectual integrity and consciousness of social obligation as have the most civilized of the surrounding Caucasians. What is also pertinent is the fact that they have the same contempt for any hypocrisy in their treatment by their white neighbors, and the same bitter resentment of a claim of their social inferiority as Americans have of the Nazi claim of Nordic racial supremacy. It is in the normal reactions of human beings to such treatment that are found factors in the problem of the validity of General DeWitt's orders.

Another admission of fact made at the hearing and not appearing in the record or in the certificate, is the presence among these citizens of a group of young men educated in Japan and returned to the United States to live in the Japanese communities. These men were admitted to be dangerously sympathetic with Japan in the present war.

What is peculiarly within our knowledge is that in our Pacific Coast schools, in their infancy and early childhood, the Japanese and Chinese children mix freely with their white companions. They are taught to revere the flag with the freedoms it connotes. When they reach adolescence, with its mating instincts and its inevitable affections, which often know no boundaries set by complexion or cheekbones or slant of the eyes, freedom is denied them in the most powerful of human instincts by the laws against intermarriage with the Caucasians.[2a] The strongest paternal discipline is exercised over the white children. They are told it is a degredation to mate with an Oriental; and the yellow skinned youth are made to feel

---

[1] The President's military zone and deportation order of February 19, 1942, and its enforcing provisions, are

"Whereas the successful prosecution of the war requires every possible protection against espionage and against sabotage to national defense material, national defense premises, and national defense utilities as defined in Section 4, Act of April 20, 1918, 40 Stat. 533, as amended by the Act of November 30, 1940, 54 Stat. 1220, and the Act of August 21, 1941, 55 Stat. 655, 50 U.S.C.A. § 104:

"Now, therefore, by virtue of the authority vested in me as President of the United States, and Commander in Chief of the Army and Navy, I hereby authorize and direct the Secretary of War, and the Military Commanders who he may from time to time designate, whenever he or any designated Commander deems such action necessary or desirable, to prescribe military areas in such places and of such extent as he or the appropriate Military Commander may determine, **from which any or all** persons **may be excluded,** and with respect to which, the right of any person to enter, remain in, or leave shall be subject to whatever restrictions the Secretary of War or the appropriate Military Commander may impose in his discretion. * * *

"I hereby further authorize and direct the Secretary of War and the said Military Commanders to take such other steps as he or the appropriate Military Commander may deem advisable to **enforce compliance** with the restrictions applicable to each Military area hereinabove authorized **to** be designated, **including the use of Federal troops** and other Federal Agencies, with authority to accept assistance of state and local agencies." (Emphasis supplied.)

[2] Justice Holmes in Abrams v. United States, 250 U.S. 616, 628, 40 S.Ct. 17, 21, 63 L.Ed. 1173.

[2a] California Civil Code § 60; 2 Idaho Gen.Laws Ann. § 31-206; Montana Civil Code § 5702; Arizona Code Ann. (1939) § 63-107.

a racial inferiority and in social contempt. Such facts are pertinent in determining whether General DeWitt is entitled to find, among a people suffering an humiliation so inconsistent with the equality of the flag teachings, that there will be those who will hesitate or fail to perform a citizen's duty in aiding his soldiers against the saboteur or spy.

The second most powerful indicium in the war zone commanded by General DeWitt of separateness and implied racial inferiority of the Mongoloid people, are the laws prohibiting them from owning agricultural land.[3] Many of the Japanese who immigrated here were farmers. Yet under these laws no child of Japanese parentage can be born on his alien father's farm. State decisions [4] show the evasions and deceits employed to satisfy that farmer's historic land hunger, which led to our own early westward migrations of the last century. Whether or not it is still a proper concept that the farmers constitute the "backbone of the nation," these 70,000 citizens know that those in farming communities are separated from their white companions by a fundamental social distinction, sometimes the more bitter in its expression by their European descended neighbors because of the superiority often shown by the Japanese in both energy and agricultural skill. These facts are entitled to be considered with reference to the likelihood of disaffection among a class so treated, in determining General DeWitt's regulations for exclusion of dangerous people from the war areas bordering the Pacific.

A third distinction, the subject of long and repeated protest from Mongoloid China and Japan, is in the Congressional laws for the exclusion of their nationals from the immigration quotas of the Europeans, the Semitic and part Semitic Western Asiatics, and the Russians of part Mongoloid blood. Neither General DeWitt nor this court is concerned with the political or social justification of this stigma on the Mongolian, but both are concerned with its effect on proud spirited people so branded by the Congress. This court, however, is in a better position than any other to know the effect of such facts on the minds of some of the now deported citizens.

A fourth discrimination of race and color is the exclusion of these citizens from many labor unions. Nothing but the stress of war gives the special permits which allow the Chinese to work in some of our war industries. Despite the outstanding mechanical skill of the Mongolian people, the freedom to make a skilled living is denied to the youth taught in our schools to point their hands at the flag which, they are told, promises each of them the dignity of equality of opportunity among his fellows.

One is not here concerned with the vigorous dispute as to the wisdom of such laws, a dispute having on the one hand examples of persons of Europe, the United States and Latin America distinguished in statecraft, the sciences and the arts, who are of Eurasian blood, both immediate of Chinese and Japanese and other Asiatic origin, and more remotely through the American Indian, and on the other the frustrated rejects from the societies of each blood.

Such questions are for the peace table. The case is solely concerned with the question whether such laws and social and industrial regulations have created a real and present danger on the eastern littoral of the Pacific, in a war which the Japanese military caste is waging after, with the aid of assassination, it destroyed an evolving Japanese democracy, having ideals in common with our own.

As a result of these and other discriminations of race and color, the Japanese of our Pacific Coast cities and towns live in segregated quarters. Though compelled to reside there by social rather than governmental force, there are many similarities with the ghettos of Europe,—among them the denial of intermarriage, of land owning, and participating in many of the livelihoods of manual skill.

Because of such limitation or social intercourse, people do not become familiar with the Mongolian physiognomy. The uniform yellow skin and, on first impression, a uniformity of facial structure, make "all Chinks and Japs look alike to

3 1913 Cal.Stat. 206, 1 Dearing Gen. Laws, Act 260; 5 Oregon Comp.Laws Ann. § 61-102; Washington, Rem.Rev.Stat. § 10582.

4 People v. Osaki, 1930, 209 Cal. 169; 286 P. 1025; People v. Entriken, 1930, 106 Cal.App. 29, 288 P. 788; Takeuchi v. Schmuck, 1929, 206 Cal. 782, 276 P. 345; People v. Nakamura, 1932, 125 Cal. App. 268, 13 P.2d 805.

me," a common colloquialism. Hence arises a difficulty for General DeWitt's soldiers or the federal civil officers in picking out from the other Japanese crowded together in the segregated districts, and including men educated in Japan, the suspected saboteurs or spies or fugitives from a commando landing or hiding parachutists. Also the difficulty of identification of Japanese of known or suspected enemy aid, by descriptions telegraphed or written to white enforcement officers.

So far as concerns the imminence of danger of Japanese attack on the Pacific Coast, this court would be compelled to find that General DeWitt has a rational ground to except it. It is a fact of general knowledge that in every Japanese air attack on cities and military establishments,—among them Chungking, Singapore, Midway, Rangoon, Dutch Harbor, and the British naval station in Ceylon,—enough planes passed through the defenses of warned and expectant commanders to cause a conflagration sufficient to destroy the wooden cities of our Pacific Coast.

What is commonly known on the Pacific Coast and not elsewhere, is the fact that, unlike London with hundreds of simultaneous fires in its brick and stone structures and yet no great moving front of conflagration, in wooden-built San Francisco there was a conflagration front of a mile length within five hours of the earthquake of 1906. It was a coalescence of but seven fires. There, luckily, the earthquake placed in on the lee-side of the city, but one started by the Japanese on its windward side, in its long maintained northwest trade wind, well could have the bulk of the city in flames in ten hours. The earthquake left the exterior of the city's frame buildings intact, save for some distortions which did not increase the conflagration hazard, but the present developed technique of shattering to pieces several acres of buildings with a single bomb, makes the debris of wooden material mere fuel piles for the succeeding inflammable projectiles. A similar conflagration danger exists in all the Pacific Coast cities. In all of them, General DeWitt well could fear the added menace of the saboteur's torches.

Since the questions certified, in effect, transfer the entire case to the Supreme Court, it is unjust to the appellant to omit from the summary of the contentions on which he relied, his claim of violations of Constitutional provisions other than the due process clause of the fifth Amendment. He also urged here that such a classification of the Japanese descended citizens from others, in a unitary scheme leading to their imprisonment without a hearing, (1) made General DeWitt's Congressionally authorized regulation a bill of attainder prohibited by Article I of the Constitution; (2) was merely an incident of a single continuing plan to seize his person in violation of the Fourth Amendment, and (3) that the scheme providing for deporting people from their homes to be imprisoned by the Military, without trial, is a cruel and unusual punishment in violation of the Eighth Amendment.

It is now nearly ten months since General DeWitt's deportation order was made. The highest court of this great circuit is fully able to decide the submitted questions. Particularly it should not avoid their decision because, as stated in the certificate, they are "difficult" and "this court knows of no decision" for a precedent.[5]

---

[5] The certificate's recitals are

"This cause thus raises novel constitutional questions of great public importance pertaining to an exercise of the war powers to enforce two important regulations which form an important part of the wartime evacuation of the Pacific Coast Japanese population. This court is familiar with the decisions of the Supreme Court of the United States upholding broad exercises of the war powers of the Federal Government. On the one hand, however, this Court knows of no decision in which citizens residing in areas not subject to martial law have been required by military authorities to observe a curfew and to report to military control stations for exclusion from a military area designated by the military authorities. On the other hand, this Court is sensible of the fact that the military authorities held the view that military exigencies of modern warfare imperiling the nation and existing on the Pacific Coast at the beginning of the present war were far more grave than any situation hitherto existing in any war with a foreign nation. No doubt because of the military authorities' view of the extreme peril facing the nation this exercise of the war powers of the Federal Government was employed. The question whether this exercise of the war power can be reconciled with traditional standards of personal liberty and freedom guaranteed by the Constitution, is most difficult. This Court, therefore, pursuant to Judicial Code, Section 239, amended (28 U.S.C.A. § 346), certifies to the Supreme Court of

The difference in time between certification and certiorari after our decision, is about four weeks if diligence is used by the Government in filing its sustaining or opposing brief. The time no doubt could be shortened by the agreement of counsel for the appellants seeking the freedom of their clients. Because of this difference in time, certiorari might cause the Supreme Court to reconvene later in June,[6] as it did in the much lesser important cases of Ex parte Quirin and others, argued July 29 and July 30, 1942. 317 U.S. 1, 63 S.Ct. 1, 2.

Under similar orders all the 70,000 Japanese descended citizens long since have been removed from the Military District No. 1 and now present no danger of sabotage or espionage. It is my opinion that a month's delay, coming after the elapse of the ten months in which the order in question has been in existence, does not warrant the avoidance of a decision of this circuit court of appeals on the matters of law and of fact involved in the appeals.

For the above reasons I dissent from the attempt by certification to avoid a decision of the only questions involved in the appeal and, if it is to be avoided, from omitting from the certificate the facts relied upon by Hirabayashi and several of his contentions. It is pertinent that the certificate then voted for and signed by a majority of this court was first seen by me yesterday (March 27th) and after protest ordered sent and sent yesterday by airmail to the Supreme Court. Our rule of practice allows ten days to distribute the dissent for its consideration prior to filing a majority decision, here to certify. Though but two days were requested, after which there is abundant time for the arrival of the certificate and its consideration before the next session of the Supreme Court, this court denied any

right to the filing of the dissent before the decision to certify was filed.

March 28, 1943.

WILLIAM DENMAN,
United States Circuit Judge

Endorsed: Opinion by DENMAN, Circuit Judge, on his dissent from the certification of questions to the Supreme Court, and from the omission of facts therefrom. Filed March 28, 1943, as amended by order of September 20, 1943. Paul P. O'Brien, Clerk.

STEPHENS, Circuit Judge (concurring in the opinion written by Wilbur, C. J.)

It is thought by the majority that the opinion of the Supreme Court in the case of Hirabayashi v. United States, June 21, 1943, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774, laid down the fundamental principles governing the instant case and that therefore no extended discussion of them is required.

The Hirabayashi case was certified to the Supreme Court of the United States, by this court, after the Attorney General had suggested that such action should be taken, and I entertain no doubt as to the wisdom of this action. That case presented certain war power constitutional questions as to which the welfare of the nation required prompt and final authoritative answers, and while this court had the jurisdiction to decide them, our decision would be the pronouncement of an intermediate court and would not be final. By promptly certifying the case it was made possible for the Supreme Court to settle the important questions during the court's Spring term. The members of this court have never differed as to their decisions in any of the Japanese cases,[1] but the opinions now being filed reveal that they have never been able to speak in concert as to their reasoning.

In preparing this concurring opinion I

---

the United States the following questions of law concerning which instructions are desired for the proper decision of the cause:" (Emphasis supplied.)

[6] The Supreme Court did not adjourn until June 21, 1943; hence the time factor between certiorari on our decision and certification was negligible. Despite the haste in certification that Court declined to pass on the question of the power to imprison and deport the citizens of Japanese descent.

Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 1386, 87 L.Ed. 1774.

[1] The group of cases before this court arising out of military orders are sometimes referred to as the "Japanese cases." They include Hirabayashi v. United States, June 21, 1943, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774, Yasui v. United States, June 21, 1943, 320 U.S. 115, 63 S.Ct. 1392, 87 L.Ed. 1793, and Korematsu v. United States, June 1, 1943, 319 U.S. 432, 63 S. Ct. 1124, 87 L.Ed. 1497.

am aware that Judge DENMAN, who does not join in the main expression of the court, concurs only in the result and advances widely different reasoning in his concurrence. To his concurring opinion he annexes an opinion which he filed in his opposition to the certification of the Hirabayashi case.[1a] It is apparent that the broad issues of the latter case are present here. This opinion does not respond to Judge DENMAN'S concurring opinion in this case, but does notice material contained in the Hirabayashi dissenting opinion.

Appellant relies heavily upon Sterling v. Constantin, 287 U.S. 378, 53 S.Ct. 190, 77 L.Ed. 375, a case in which the subject of state martial law and the jurisdiction of federal courts in regard thereto is treated.

It is noteworthy that the Supreme Court in the Hirabayashi case did not mention the Sterling case, and this fact makes it quite conclusive that the supreme judicial body of the nation regarded the law applicable to a local disturbance as having little analogy to the legal power of our government to resist an attempt to subject it and the American people to a foreign will. This, in my opinion, is one of the cardinal errors of the appellant's case as it has been presented to us. One paragraph of the Supreme Court's main opinion in the Hirabayashi case is sufficient to guide us as to the extent of the war powers of the President and the Congress and is sufficient to inform us that we are not to sit in judgment over the wisdom of actions taken under such powers.

We quote from the main opinion: "Since the Constitution commits to the Executive and to Congress the exercise of the war power in all the vicissitudes and conditions of warfare, it has necessarily given them wide scope for the exercise of judgment and discretion in determining the nature and extent of the threatened injury or danger and in the selection of the means for resisting it. Ex parte Quirin, supra, 317 U.S. 1, 28–29, 63 S.Ct. 2, 10–11, 87 L.Ed. 1, cf. Prize Cases, supra, 2 Black 670, 17 L.Ed. 459; Martin v. Mott, 12 Wheat 19, 29, 6 L.Ed. 537. Where, as they did here, the conditions call for the exercise of judgment and discretion and for the choice of means by those branches of the Government on which the Constitution has placed the responsibility of warmaking, it is not for any court to sit in review of the wisdom of their action or substitute its judgment for theirs."

At this point it would perhaps be well to note that the legality of restraining Japanese aliens or American citizens of Japanese ancestry to War Relocation Centers is not in this case nor was this question involved in the Hirabayashi case. The actions of General DeWitt,[2] considered in this case, were under the authority of Congressional Acts and Executive Orders and were taken as steps to control the appellant and others preparatory to their removal from the military zone in which they found themselves.

Appellant had resisted the government's right to take this war move so far as his person was concerned, and he was arrested and convicted of violating the order. We are asked, in effect, to annul the conviction by deciding that in our judgment the defensive strategy of the General in charge was not justified by the facts and therefore was illegal and unconstitutional.[2a] The appeal indicates a lack of understanding of the comparative rights of

---

[1a] That opinion was filed March 28, 1943, and was amended September 20, 1943, and again amended December 1, 1943, as of September 20, 1943. Although the unamended opinion appeared in our advance sheets and was published in various law journals and widely circulated, it has not been published in the official federal reporter. This because written comment by one of the judges stating his dissent to the order of certification was not considered an opinion in a case, hence was not forwarded to the publishers of the Federal Reporter. The original dissent which was widely published, as I have said, contained comment regarding Admiral Perry's expedition to Japan, which in my opinion gave a wrong impression of that epochal event and of the great sailor-diplomat heading it. If my comment upon the Perry expedition as it appears in this opinion should impress the reader that I attack a proposition not advanced in the case. Since the amendments to the Hirabayashi dissent opinion have been made. I explain that a misunderstanding of that expedition could result in a monstrous conception that Pearl Harbor was more or less a repayment to us in our own coin. Nothing could be more erroneous.

[2] Lieutenant-General John L. DeWitt, Commanding General, Western Defense Command and Fourth Army, during the period herein considered.

[2a] Disobedience to the General's orders is made an offense triable and punishable

individuals in times of peace and in times of war. The great and far reaching power necessary to the prosecution of war, of course, disturbs the ordinary habits and customs of the civilian. It always has done so, but modern war has brought home to us a clearer realization that civilians as well as the armed forces are under the compulsion of acting in cooperation with military necessity. The duty of making final decisions in the prosecution of war must be placed somewhere and the Constitution places this duty with the Congress and the President. How weak indeed our country would be in the kind of world· in which we live, if before their validity could be regarded as certain, war strategy orders would have to be ratified and validated by the courts after a trial of fact as to their necessities. The President may not declare war, Congress does that, but the President is the Commander-in-Chief. His, as Mr. Chief Justice Hughes has said, is the duty not only to wage war but to wage war successfully. The border line of that power has never been defined. It is the genius of our representative government that as great a part of war action as is possible shall be under Congressional enactment and every President in every war we have ever prosecuted has adhered to this principle. The Congress controls the purse strings and this alone is sufficient to make cooperation between the executive and the legislative authorities absolutely necessary. It has been adhered to in the action taken upon which this case is brought. There is no sanction in our governmental scheme for the courts to assume an overall wisdom and superior virtue and take unto themselves the power to visé the Acts of Congress and the President upon war matters so long as such acts are not in conflict with provisions of the Constitution itself. It is idle to go further and speculate as to what would or should happen in in-

stances where courts and the other two branches of the government were immovably aligned against each other.[3] Any such situation would mean the failure of the government structure itself.

A large part of our Pacific Ocean Navy had been wrecked in a peace time treacherous raid by Japan and America had declared war almost immediately. The General charged with the defense of the Western mainland proceeded under Congressional Acts and Executive orders to control the movement of Japanese nationals and American-born of Japanese ancestry preparatory to their removal from the coastal zone. Appellant resisted the military orders designed to accomplish these ends.

It seems to me that the situation as we now see it absolutely negatives the idea that the district court had or the circuit court has any jurisdiction to pass upon the issue of necessity for the war action taken. To me it is quite preposterous that either of the courts mentioned should assume the legal power to require a showing in a public trial as to whether or not those ordered excluded from the zone included fifth columnists, enemy informers or saboteurs.[3a]

However, Judge DENMAN opposing the certification of the Hirabayashi case to the supreme court states in his dissenting opinion that this court, which is made up of men long residing in or near the Pacific slope and who have come in contact with Japanese is therefore especially qualified to know and understand whether or not there was in fact a good military reason for the actions questioned in this case.

If I understand the views expressed in the dissenting opinion in the Hirabayashi case, it is that the district court should try the legality of General DeWitt's orders upon evidence of their necessity

under civil court jurisdiction. The punishment dealt out is not claimed to be cruel and unusual and for that reason unconstitutional. As a matter of fact appellant was placed under a six months' probationary sentence.

[3] There have been a few instances in which conflict between the military and the courts have occurred. No satisfactory solution to this impasse has been worked out. Good sense has come to the rescue in most instances and peace has come without victory to either side. The American people do not take kindly to military government, and public sentiment remains the driving force that compels its limitations.

[3a] I do not regard the ordering of appellant to remain in a given place or to stay in a given place in order to be later evacuated from the zone as a part of subsequent incarceration after he has been evacuated. It is refreshing to note that not one so evacuated and thereafter confined in an assembly center or war relocation center has prosecuted a petition for a writ of habeas corpus to decision.

whether the evidence consist of testimony or judicial notice or both and that this court should review the judgment of the district court upon the evidence taken and upon the several judges' personal knowledge of the Japanese people. Thus, if after a trial of the facts it should be found that the general issuing the order had good cause for thinking that the people who were ordered excluded from the coastal zone might cause trouble, these courts should hold the order legal, otherwise they should nullify it. Upon this premise restrictions upon the activities of Japanese in the Pacific Coast states both legal and social are judicially noticed in the dissenting opinion as likely to produce anti-American or pro-Japanese acts in resentment and these facts therefore constitute evidence supporting the order. As material intending to establish the unreasonableness of the General's order under attack the author of the dissenting opinion cites a statement of government counsel made in response to a question propounded to him from the bench by Judge DENMAN that no indictment or information charging espionage, sabotage or treasonable act has been filed against those subject to the questioned orders.[4] I am in total disagreement with this theory.

I feel impelled to comment upon Commodore Perry's expedition to the Liu Chiu and Japanese Islands in 1853,[5] because it has been misdescribed as an act of aggression from which a Pearl Harbor and a Japanese hatred would more or less naturally flow. It is sufficient, of course, so far as we are to be concerned with the issues of this case, that war existed between the United States and Japan when General DeWitt issued the orders here questioned and that a powerful attempt to invade the West Coast seemed imminent. It could not

be doubted that aid would be afforded the invading forces by Japaneses nationals and some sympathizing citizens of Japaneses ancestry.

However, it is historically incorrect to assume that the necessity for the military control of resident Japanese-blooded people is the visitation of our father's sins upon us.

Commodore Perry with his small American fleet was not bent upon a blustering imperialistic invading expedition when he went into Japan. The Russian, Portuguese, English and Dutch had been there long before under the most limited and humiliating restrictions. We had great need for a station westerly of Honolulu wherein our ships of commerce (by this time steamships as well as clippers) could "be supplied with wood, water, provisions, and coal, and other articles their necessities may require * * *." (Article II of the treaty negotiated by Commodore Perry, 11 Stat. 597.) The sailors of our merchant marine had been cruelly treated and murdered when they scrambled upon Japanese rocks from their storm wrecked vessels. There was no consular or ambassadorial officer through which we could officially express our needs, and there was no working mode of communication through which our protests could be conveyed. The Perry expedition was officially dispatched by the President of the United States under the most careful instructions to communicate our needs and register our protest to the Government of Japan through tact and consideration.[6]

A very interesting, short account of Perry's expedition, its purposes and accomplishments is contained in Ambassador Joseph C. Grew's book, entitled "Report from Tokyo." I quote from it in the margin.[7]

---

4 During this period there were numerous accounts in the press of the discovery of short wave radios, cameras and arms found in the possession of Pacific Coast Japanese long after they had been ordered turned in to the military authorities. Students of Japanese officials' conduct know such officials to be the equal of any in the fine are of espionage and knows that they excel in practice of deception behind the mask of gracious politeness.

5 Dennett, Tyler, "Americans in Eastern Asia," The Macmillan Co., N. Y., 1922; Barrows, Edward M., "The Great Commodore," The Bobb-Merrill Co., N. Y., 1935; Treat, Payson J., "Diplomatic Relations Between the United States

and Japan, 1853–1895," vol. I, Stanford University Press, 1932.

6 For text of treaty, see Perry's "Narrative of the Expedition of an American Squadron to the China Seas and Japan," page 440, et seq.

7 "It is necessary that we now assess, coolly and impassively, the events of the past ninety years in the Pacific—the ninety years that have elapsed since Commodore Perry concluded with Japan the treaty that opened the way for the subsequent admission of Japan into the family of nations.

"We are today being given dreadful evidence that the process of Japan's emergence from three centuries of isolation and

Upon Commodore Perry's return he made an exhaustive, thoroughly documented official report of his expedition to his government, entitled "Narrative of the Expedition of an American Squadron to the China Seas and Japan." At page 108 of this Narrative, the text of Secretary of State Edward Everett's supplemental instructions to Perry is printed, and I briefly quote therefrom. (The original instructions had been drawn by Secretary of State Daniel Webster, predecessor in office of Mr. Everett.) "The President concurs * * * that you should secure one or more ports of refuge of easy access. If you find that these cannot be obtained in the Japanese islands without resort to force, it will be necessary that you should seek them elsewhere. * * * In establishing yourself at one or two convenient points * * *, with the consent of the natives, you will yourself pursue the most friendly and conciliatory course * * *. Take no supplies from them except by fair purchase, for a satisfactory consideration. * * * Make no use of force, except in the last resort for defence, if attacked, and self-preservation."

If Perry was ready for eventualities when his vessels poked their way into the land-locked harbor of "Yeddo,"[8] he was only being cautious in the light of history and living up to the traditions of our navy. An American vessel some years before

---

of her assimilation into the family of nations is far from complete. Except for brief contacts at widely spaced intervals * * * Japan had * * * been in virtual isolation since the very beginning of her history. * * * Her polity, then as now, was tribal in character. As a nation, the Japanese possessed the virtues of a tribal community: homogeneity and subordination of the individual to the community; but they also possessed the defects and weaknesses of a primitive community: they revered the tribal sanctions and feared change. * * * Although the American Government was cognizant of the trend * * *, its purpose in sending Commodore Perry to Japan in 1853 was primarily to ameliorate conditions which grew out of the growing commerce of the United States with China and the presence of a large number of American whaling ships off the coast of Japan. The advent in the China trade of steamships, with their limited capacity to carry coal, created insistent need for at least one coaling station intermediate between the Pacific coast of America and China. Further, American vessels had been shipwrecked in Japanese waters, and American seamen * * * had been treated with inconceivable brutality. A third consideration was the need for establishing depots in Japan from which American whaling ships could restock themselves * * *.

"After incredible obstacles and difficulties, Commodore Perry succeeded on March 31, 1854, in concluding with the Japanese a treaty which, although limited in scope, met the immediate needs of the moment. However, it contained one feature the importance of which the Japanese had not foreseen, and that was the assent of the Japanese to the stationing in Japan of an American consular officer. It was in the exercise of that treaty provision that the United States dispatched to Japan in 1856 its first diplomatic representative, Townsend Harris.

"The selection of Harris * * *. was an extraordinarily happy one. He had * * * acquired a familiar knowledge of Japan * * * of government, of their customs, and of their characteristics; and he had dedicated himself to the task of helping the Japanese to prevent the extension to Japan of exploitative practices pursued by the white man in his dealings with the backward peoples of the East. * * * So long as Japan remained in seclusion, * * * she was not entitled to the privileges which membership in the family of nations would confer; and it was Harris' aim to induct Japan into the family of nations under the most favorable auspices. He prepared and, after intolerable delays and indignities imposed upon him by the Japanese, presented to the Japanese Government a Treaty of Commerce and Navigation of the most liberal character possible. * * * It took Harris two years of patient and tactful negotiation before his treaty was signed. But this American did far more than negotiate a treaty. He educated the Japanese officials in the ways of diplomacy, international law, economics, and commerce. He provided Japan with the information which she needed to merge into the world. * * * A Japanese, Dr. Inazo Nitobe, wrote of him: 'A man of stern rectitude and gentlest powers of persuasion, he, indeed, more than any other, deserves the epithet of benefactor: because in all his dealings with us, the weaker party, he never took advantage of our ignorance, but formulated a treaty with the strictest sense of justice.' * * *."

8 See Chapter XV, Barrows "Great Commodore." The Japanese had been informed of Perry's coming as Japanese boats brought the news to them from Shui, the capital of the Islands of Liu Chiu where Perry had anchored for some time.

had been fired upon when the Japanese learned that it had been disarmed by its skipper as proof of its peaceful intentions. Officers and men of the United States Gunboat Preble had had great difficulty in rescuing nineteen men who had been shipwrecked and had been held in prison for eighteen months by the Japanese Government.[9] What Perry [10] did and how he and his men conducted themselves after they entered the Japanese harbor have their great importance. No shot was fired, and he markedly succeeded in his mission after long and practically inexhaustible patience.

Any well-informed Japanese knows that Perry's expedition with the American nation behind it saved Japan from being cruelly invaded by power- and commerce-hungry nations in the grand day of imperial conquests.

In my opinion the considerations upon which General DeWitt acted were much more fundamental than the necessity for defense against a Japaneses retaliation for the Perry incident or for a defense against Japaneses retaliation upon the score of legal restrictions and social discriminations suffered by American citizens of Japanese descent or by Japanese nationals in the United States.

General DeWitt's orders were issued in the light of a knowledge of Japan bent upon accomplishing a Gargantuan racial dream of *"Hakka Ichi U,"* the eight corners of the earth under the Japanese roof, or supremacy over all peoples.[11] [11a] This fatal ideology has driven powerful nations throughout history to commit unmeasured and unnumbered crimes only to cause them to sink into dishonor and impotence. Our military command knew of the monstrous practices of the Japanese in occupied China and it knew of the especial danger from the ranks of the *Kibei* [12] upon our western coast.

There are many loyal American citizens of Japanese descent who are bearing their burden uncomplainingly—a burden heavy enough, it is true, but light indeed compared with that of other thousands.

---

[9] See Perry's "Narrative," page 60, for account of a Japanese attack upon the United States Steamer Morrison, its officers and men, when it sailed into a Japanese harbor with guns removed, upon a mission of amity and mercy to return Japanese nationals who had been shipwrecked upon our Pacific shores, and Dennett, "Americans in Eastern Asia," page 246. See, also, experience of United States Gunboat Preble, in the "Narrative."

[10] Mathew Culbraith Perry was a midshipman at fourteen, served with distinction in the war of 1812, and in the war with Mexico. His brother was Oliver Hazard Perry of Lake Erie fame. Commodore Perry ranks as one of the great figures of our Navy's glorious history. As a diplomat he ranks among the great of that calling.

[11] See "How Japan Plans to Win," Kinoaki Matsuo. (Translation. Little, Brown & Co., Boston, 1942.)

See General Araki in a widely circulated pamphlet setting out Japan's national policy, published in 1933 in Ta Kung Pao.

[11a] The following taken from Vol. III, No. 12, (Nov. 1, 1943) Contemporary China, condenses the Japanese conception of their Mikado and his place in the government as follows:

"1. He is a divine person, descended from a goddess, and therefore not subject to any human laws.

"2. He is so aloof from mundane affairs that he does not take direct part even in the business of governing his own country.

"3. He acts only on the advice of his ministers and is therefore not responsible for anything done in his name.

"4. He occupies a throne which is established forever, and continues a line of rulers 'unbroken for ages eternal.'

"5. He is destined to be the ruler of all nations, when all peoples from the 'eight corners' of the world will be brought under 'one roof.'

"6. Any war fought in his name is a holy war, and anyone who is killed while fighting his war becomes immortalized as a god in the Shinto pantheon."

[12] Kibei—American-born of Japanese descent who have been sent to Japan in their early youth for indoctrination in Japanese customs and religious and governmental beliefs and have then been returned to the United States.